UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------

WALLACE DAVENPORT,

                  Plaintiff,

        v.

THE CITY OF NEW YORK and DETECTIVE
ADAM SAGER,

                Defendants.

------------------------------------------------------------

**MEMORANDUM & ORDER**
15-CV-5890 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Wallace Davenport commenced the above-captioned action on October 15, 2015, against Defendants the City of New York and Detective Adam Sager of the New York City Police Department ("NYPD"). (Compl., Docket Entry No. 1.) Plaintiff's claims arise from his arrest on October 24, 2014, for allegedly pickpocketing a pedestrian in Times Square. (*Id.* ¶¶ 9, 15.) Plaintiff brings claims under 42 U.S.C. § 1983 for false arrest, denial of his right to a fair trial, deprivation of due process and malicious prosecution, and also brings claims under New York state law for denial of his right to a fair trial, deprivation of due process, malicious prosecution and vicarious liability. (*Id.* ¶¶ 26–37.) Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Defs. Mot. for Summ. J. ("Defs. Mot."), Docket Entry No. 22; Defs. Mem. in Supp. of Defs. Mot. ("Defs. Mem."), Docket Entry No. 24.) For the reasons discussed below, the Court grants Defendants' motion.[1]

---

[1] Defendants move for summary judgment on Plaintiff's federal and state due process claims. (Defs. Mem. 19–20.) In Plaintiff's opposition to Defendants' motion, Plaintiff consents to the dismissal of any due process claims other than his fabrication of evidence claim. (Pl.

## I. Background

This case arises from Plaintiff's arrest and the initiation of a prosecution against Plaintiff following an investigation by Detective Sager, which led a complainant to identify Plaintiff as the perpetrator of a pickpocketing in Times Square. (Compl. ¶¶ 9, 15.)

### a. The pickpocketing in Times Square

On May 13, 2014, at 6:40 PM, a complainant walked into an NYPD substation at the intersection of West 43rd Street and Seventh Avenue in Manhattan, New York (the "NYPD Substation") and filed a complaint with NYPD Officer Mark Mitchell. (NYPD Compl. at 1, Docket Entry No. 25-7; Decl. of Ashley Garman in Supp. of Defs. Mot. ("First Garman Decl."), Docket Entry No. 22; Officer Mitchell Dep. Submission A 13:21–14:21, 18:23–19:14, annexed to First Garman Decl. as Ex. F.)[2] Officer Mitchell prepared a complaint based on the information provided by the complainant. According to the complainant, approximately two hours earlier, between 4:30 and 4:45 PM, while walking south near 46th Street in Times Square with an unzipped purse over her shoulder, someone "brushed against" her and "upon further investigation," she realized that she did not have her wallet. (NYPD Compl. at 2.) The

---

Mem. of Law in Opp'n to Defs. Mot. ("Pl. Opp'n.") 22, Docket Entry No. 30.) Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's due process claims.

[2] The parties submitted three different excerpts of Officer Mitchell's deposition and each submission contains pages that are not included in the other submissions. (*See* First Garman Decl.; Decl. of Michael Lumer ("Lumer Decl."), Docket Entry No. 29; Decl. of Ashley Garman in Further Supp. of Defs. Mot. ("Second Garman Decl."), Docket Entry No. 28.) For clarity, the Court will refer to the submission annexed to the First Garman Declaration as Exhibit F as "Officer Mitchell Deposition Submission A," the submission annexed to the Lumer Declaration as Exhibit 1 as "Officer Mitchell Deposition Submission B," and the submission annexed to the Second Garman Declaration as Exhibit O as "Officer Mitchell Deposition Submission C."

complainant's wallet contained her debit card and her credit card, her driver's license and her passport.[3]  (*Id.* at 4.)

The NYPD Substation where Officer Mitchell worked is part of the Midtown South Precinct.  (Officer Mitchell Dep. Submission A 13:21–14:21, 19:11–14.)  Because the complainant last recalled being in possession of her wallet at the intersection of 46th Street and Broadway, which is within the jurisdiction of the NYPD's Midtown North Precinct, Officer Mitchell identified that location as the scene of the crime and his supervisor forwarded the complaint to the Midtown North Crime Analysis unit.  (Detective Sager Deposition Submission A 27:22–28:2, annexed to First Garman Decl. as Ex. E; Officer Mitchell Dep. Submission A 59:5–17; Officer Mitchell Dep. Submission B 33:4–34:23, 39:23–24, annexed to Lumer Decl. as Ex. 1.)[4]

Sometime after Officer Mitchell completed his report, an unidentified investigator from the Midtown North Crime Analysis unit re-interviewed the complainant about the incident.  (Detective Sager Dep. Submission A 48:21–49:25; Officer Mitchell Dep. Submission A 48:15–24.)  The investigator added to the complaint initially prepared by Officer Mitchell.  (Officer Mitchell Dep. Submission B 46:1–25, 49:1–50:11.)  In explaining the circumstances of the incident, the complainant told the investigator that she had been in Times Square to purchase

---

[3]  Prior to reporting the incident, the complainant had canceled her debit and credit cards and confirmed that no unauthorized charges had been made on any of the cards.  (NYPD Compl. at 2.)

[4]  The parties submitted three different excerpts of Detective Sager's deposition and each submission contains pages that are not included in the other submissions.  (*See* First Garman Decl.; Lumer Decl.; Second Garman Decl.)  For clarity, the Court will refer to the submission annexed to the First Garman Declaration as Exhibit E as "Detective Sager Deposition Submission A," the submission annexed to the Lumer Declaration as Exhibit 2 as "Detective Sager Deposition Submission B," and the submission annexed to the Second Garman Declaration as Exhibit P as "Detective Sager Deposition Submission C."

tickets at 48th Street and Broadway and, after purchasing the tickets, she began to proceed south on Broadway. (NYPD Compl. at 2.) When she reached 46th Street and Broadway, she felt a male "reach into her [unzipped] purse" and remove her wallet. (*Id.*) She confronted the alleged perpetrator and requested that he return her wallet but he told her that he had not taken her wallet and that the man who had taken it had fled. (*Id.*) The complainant described the alleged perpetrator as a white thirty year-old Hispanic man with short brown hair, who was approximately six feet tall, weighed 180 pounds and was wearing "beige" "outerwear-Tshirt or Tank Top." (*Id.* at 2–3; Detective Sager Dep. Submission A 53:14–53:25.)

### b. Detective Sager's investigation of the pickpocketing

Detective Sager was assigned to investigate the complaint. (Detective Sager Dep. Submission A 32:21–33:21; Detective Sager NYPD Follow-Up Forms ("Detective Sager DD5s"), Docket Entry No. 25-8.) After reviewing the complaint, Detective Sager met with the complainant twice, visited the scene of the incident with the complainant and obtained video surveillance of the complainant's interaction with the alleged perpetrator after the pickpocketing.

### i. May 17, 2014 meeting

On May 17, 2014, between 1:00 and 1:30 PM, Detective Sager arranged a meeting with the complainant at the Midtown North Stationhouse. (Detective Sager Dep. Submission A 32:5–32:20, 59:9–59:16, 87:10–88:9; Detective Sager DD5s at 2.) In recounting the incident, the complainant told Detective Sager that on May 13, 2014, she had been walking southbound on Broadway in the Times Square area and was in the vicinity of 46th Street and Broadway when she felt someone "digging around in her bag." (Detective Sager DD5s at 2.) The complainant turned around and there was a man standing beside her. (Detective Sager Dep. Submission A 77:12–17, 78:10–23, 93:5–18; Detective Sager DD5s at 2.) As she turned around, she also

realized that her wallet that she had placed in her purse a few blocks before was no longer in her purse.[5]  (Detective Sager Dep. Submission A 77:14–17; Detective Sager DD5s at 2.)  The complainant confronted the alleged perpetrator and he responded, "the other guy did it, the guy in black over there" as he pointed behind the complainant.  (Detective Sager Dep. Submission A 77:18–21; Detective Sager DD5s at 2.)  The complainant turned around but did not see anyone "in black" and when she turned back around to speak to the alleged perpetrator he was no longer there.  (Detective Sager Dep. Submission A 77:22–78:3; Detective Sager DD5s at 2.)

The complainant described the alleged perpetrator as a skinny white or white Hispanic man in his mid-to-late thirties, approximately six feet tall, and possibly wearing a khaki shirt.  (Detective Sager Dep. Submission A 79:13–80:5, 80:14–17; Detective Sager DD5s at 2.)  She did not identify any other distinctive features.[6]  (Detective Sager Dep. Submission A 79:16–19, 79:23–80:2; Detective Sager DD5s at 2.)  According to Detective Sager, after the interaction with the alleged perpetrator, the complainant reported the incident to NYPD officers on the street, and the officers directed her to the NYPD Substation where she filed the complaint with Officer Mitchell.  (Detective Sager Dep. Submission B 224:10–18.)

After the interview and based on the complainant's description of the alleged perpetrator, Detective Sager showed her approximately 198 photographs generated by the NYPD's Photo Manager Program, but she did not identify the alleged perpetrator in any of the photographs.

---

[5]  According to Detective Sager's deposition testimony, the complainant told him that her wallet was red.  (Detective Sager Dep. Submission A 93:12–23.)  However, Detective Sager never memorialized that the wallet was red in any of the NYPD records and the complaint listed the missing wallet as "brown/tan pattern."  (NYPD Compl. at 4.)

[6]  Detective Sager's DD5 does not include any information regarding the alleged perpetrator's hair type.  (Detective Sager DD5s.)

(Detective Sager Dep. Submission A 36:2–37:10, 94:8–12, 97:21–9; Detective Sager DD5s at 3; Mugshot Viewing Report and Witness Summary, Docket Entry No. 25-9.) Detective Sager generated the 198 photographs using the following physical attributes: white Hispanic male, between thirty-two and forty-two years old, between five feet nine inches and six feet two inches tall and weighing between 130 and 220 pounds.[7] (Mugshot Viewing Report and Witness Summary; Detective Sager Dep. Submission A 99:11–25.)

### ii. May 20, 2014 meeting

On May 20, 2014, three days after Detective Sager's initial interview, Detective Sager went with the complainant to the area where the incident occurred to have the complainant identify the exact location where she encountered the alleged perpetrator. (Detective Sager Dep. Submission A 78:20–79:4, 106:10–23.) After the complainant identified the location of the incident as Broadway between 45th Street and 46th Street, Detective Sager and the complainant entered an American Eagle store located at 1555 Broadway in search of surveillance video of the incident. (Detective Sager Dep. Submission A 108:2–109:11.) Although the American Eagle surveillance camera did not capture the pickpocketing, it captured video of the complainant speaking with the alleged perpetrator on the southwest corner of 45th Street and Broadway.[8] (Detective Sager DD5s at 4–5.) Detective Sager and the complainant watched the video at the American Eagle store. (Detective Sager Dep. Submission A 110:16–24.) According to Detective Sager's report memorializing the content of the video, "it appears that the [alleged]

---

[7] The categories for "hair color," "hair length" and "hair style" were designated as "N/A" in the "selection attributes." (Mugshot Viewing Report and Witness Summary.)

[8] Detective Sager's DD5 misidentifies the location of the conversation as the northeast corner of 46th Street and Broadway; the actual location was the southwest corner of 45th Street and Broadway. (Defs. Detective Sager Dep. 127:3–12.)

perpetrator has [the complainant's] wallet in his hand after he disengages from [her]," (Detective Sager Dep. Submission A 127:17–128:14; Detective Sager DD5s at 4–5), and the alleged perpetrator "appears to be a male black or Hispanic with a light complexion," (Detective Sager Dep. Submission A 128:15–129:2; Detective Sager DD5s at 5).[9] Detective Sager obtained a copy of the video. (Detective Sager DD5s at 4–5.)

### iii. Surveillance video

The approximately one-minute-long color video captures the complainant interacting with the alleged perpetrator on the sidewalk on the west side of Broadway from 4:49:45 PM until 4:50:28 PM. (Video dated May 13, 2014 ("Video"), Docket Entry No. 25-10; Detective Sager Dep. Submission C 203:2–204:19, annexed to Second Garman Decl. as Ex. P.) The complainant and the alleged perpetrator are engaged in conversation when they first appear in the video, heading southbound from 46th Street toward 45th Street, and walking shoulder to shoulder, with the alleged perpetrator to the right of the complainant.[10] (Video; Detective Sager Dep. Submission C 205:4–24.) Approximately thirty seconds after they appear on the video, the complainant and the alleged perpetrator stop walking. (Video.) The complainant turns to face the alleged perpetrator and simultaneously looks into her unzipped purse on her shoulder and puts her hand inside her purse as if searching for something. (Video.) Appearing to react to the

---

[9] Detective Sager did not state that the complainant accompanied him to the scene of the incident or that she viewed the video with him in his DD5 report. (Detective Sager Dep. Submission A 109:8–16.) However, at his deposition, Detective Sager explained that the complainant had accompanied him to obtain and view the surveillance video and that it was the complainant who identified her wallet in the alleged perpetrator's hand based on her review of the surveillance video. (Detective Sager Dep. Submission A 93:19–24; 127:23–128:14.)

[10] Detective Sager recalled that the complainant was a white female in her twenties between five feet two inches and five feet eight inches tall and of average body type. (Detective Sager Dep. Submission A 101:9–25.) The alleged perpetrator does not appear to be much taller than the complainant in the video.

complainant's actions or words, the alleged perpetrator turns his body one hundred and eighty degrees, lifts his right arm and points in the direction from which the two had just walked. (Video.) The complainant stops looking in her purse and turns her head to look in the direction where the alleged perpetrator is pointing. (Video.) The complainant looks back at the alleged perpetrator a few times while she continues to converse with the alleged perpetrator and while the alleged perpetrator continues to point in the same direction. (Video.) The alleged perpetrator then turns and takes a few steps away from the complainant, moving in the direction of 45th Street at a diagonal angle toward the surveillance camera. (Video.) The complainant lingers for a second appearing hesitant but then walks away in the direction where the alleged perpetrator had been pointing. (Video.) The alleged perpetrator continues to walk away from the complainant as if planning to make a right turn onto 45th Street. (Video.) The alleged perpetrator looks over his shoulder in the complainant's direction as the video ends. (Video.) The video does not provide a clear view of the alleged perpetrator's facial features.[11]

### iv. Photographic array

After obtaining the video, Detective Sager returned to the precinct without the complainant. While reviewing the video, he asked NYPD Officer Steven Hanna to watch the

---

[11] When the complainant and the alleged perpetrator first enter the video, the alleged perpetrator appears to have a red object in his left hand, which is the hand closest to the complainant. (Video.) After the alleged perpetrator turns his body in the direction where he and the complainant had just walked from, the alleged perpetrator's left hand holding the red object is by his side on the side of his body furthest away from the complainant. (Video.) Before walking away from the complainant, the alleged perpetrator drops his right arm, which he had been using to point and takes a step away from the complainant but then briefly brings both of his hands to his chest, including the hand with the red object, as if to indicate that he is referring to himself, and again points his right arm in the direction from which the two had just walked. (Video.) The alleged perpetrator then turns away from the complainant and walks away. (Video.)

video to help him identify the alleged perpetrator in the video.[12]  (Detective Sager Dep.

Submission A 138:23–139:23.)  Officer Hanna watched the video and told Detective Sager that

the alleged perpetrator "looks like Wallace Davenport.  I arrested him last year."[13]  (Detective

Sager Dep. Submission A 139:6–9, 141:15–142:3; Misdemeanor Criminal Complaint.)  After

speaking with Officer Hanna, Detective Sager decided to include Plaintiff's photograph in a

photographic array.[14]  (Detective Sager Dep. Submission A 138:11–139:9.)  Detective Sager

contacted the complainant and asked her to return to the precinct to view a photographic array.

(Detective Sager Dep. Submission A 142:5–10.)

On May 20, 2014, at approximately 11:00 PM, Detective Sager showed the complainant

a photographic array with six photographs of individuals he selected from a group of

photographs generated by the NYPD's Photo Manager Program based on parameters Detective

Sager input into the program.  (Detective Sager Dep. Submission A 132:5–21, 138:4–10; NYPD

Photo Array 273724 and Photo Array Viewing Report, Docket Entry No. 25-12.)  A photograph

of Plaintiff was included in the photographic array in position number five.  (Detective Sager

---

[12]  Officer Hanna was part of the Manhattan South Grand Larceny unit, which covers the geographical area south of Central Park and happened to be at the Midtown North Precinct that day, even though that is not his ordinary assignment.  (Detective Sager Dep. Submission A 140:6–141:10.)  Approximately eighteen months earlier, on December 7, 2012, Officer Hanna had signed a Misdemeanor Criminal Complaint charging Plaintiff with attempted grand larceny in the fourth degree, resisting arrest and jostling.  (Misdemeanor Criminal Complaint dated Dec. 7, 2012, Docket Entry No. 25-11.)

[13]  Detective Sager understood Officer Hanna to have only indicated that he thought the alleged perpetrator in the video could be Plaintiff.  (Detective Sager Dep. Submission B 151:3–11.)

[14]  Detective Sager could not recall whether he searched Plaintiff's arrest history prior to including him in the photographic array but believes that he "probably" checked to see whether Plaintiff was in custody.  (Detective Sager Dep. Submission A 142:16–143:7.)

DD5s at 6; Detective Sager Dep. Submission A 134:18–135:8; NYPD Photo Array 273724 and Photo Array Viewing Report.) All six individuals in the photographic array were bald males with facial hair and all had a "brown" complexion. (Detective Sager Dep. Submission A 149:15–18; NYPD Photo Array 273724 and Photo Array Viewing Report.) According to Plaintiff, around the time of the alleged incident, Plaintiff was of "average" build, bald, five feet four inches tall and weighed approximately 150 pounds. (Pl. Dep. Submission A 19:17–20:7, 22:4–8, annexed to the First Garman Decl. as Ex. D.)[15] Although Plaintiff never identified himself as Hispanic, he identifies his complexion as "brown skin." (*Id.* at 20:10–14.)

Detective Sager asked the complainant if she recognized anyone and she identified number five as the alleged perpetrator "who took [her] wallet." (*Id.*; Detective Sager Dep. Submission A 133:9–16; NYPD Photo Array 273724 and Photo Array Viewing Report; Detective Sager DD5s at 6.) The complainant initialed the photographic array under Plaintiff's picture and signed the Photo Array Viewing Report. (Detective Sager DD5s at 6; Detective Sager Dep. Submission A 145:16–149:14; NYPD Photo Array 273724 and Photo Array Viewing Report.)

After the complainant identified Plaintiff as the alleged perpetrator who took her wallet, Detective Sager prepared an investigation card ("I-card") for Plaintiff in order to apprehend him. (Detective Sager Dep. Submission A 162:21–163:22; Detective Sager DD5s at 7.)

---

[15] The parties submitted two different excerpts of Plaintiff's deposition and each submission contains pages that are not included in the other submissions. (*See* First Garman Decl.; Lumer Decl.) For clarity, the Court will refer to the submission annexed to the First Garman Declaration as Exhibit D as "Plaintiff Deposition Submission A," and the submission annexed to the Lumer Declaration as Exhibit 3 as "Plaintiff Deposition Submission B."

### c. Arrest and prosecution

Several months later, on October 24, 2014, NYPD officers arrested Plaintiff in Brooklyn, New York pursuant to the I-card and took him to the Midtown North Precinct where Detective Sager processed the arrest.  (Detective Sager Dep. Submission A 20:13–15, 177:15–17, 178:9–179:11; Compl. ¶¶ 9–10; Pl. Dep. Submission A 47:22–25; Pl. Statement of Material Facts Pursuant to Local Rule 56.1 ("Pl. 56.1") ¶ 45, Docket Entry No. 31.)  According to Detective Sager, he did not speak with Plaintiff while he was in custody on October 24, 2014, because Plaintiff was represented by counsel at the time he arrived at the Midtown North Precinct. (Detective Sager Dep. Submission B 211:9–20.)  According to Plaintiff, he told Detective Sager that he was working on the day of the incident.  (Pl. Dep. Submission B 68:1–3.)

On the day of Plaintiff's arrest, Detective Sager swore to a Felony Criminal Complaint, based on the information provided to him by the complainant, charging Plaintiff with grand larceny in the fourth degree in violation of New York Penal Law section 155.30(4) and jostling in violation of New York Penal Law section 165.25(1).  (Felony Criminal Complaint dated Oct. 24, 2014, Docket Entry No. 25-13.)  From the Midtown North Precinct, Plaintiff was taken to Central Booking, where he was arraigned approximately six hours after he arrived.  (Pl. Dep. Submission A 58:6–11.)  Plaintiff's bail was set by the court at $3500 and Plaintiff was detained in a New York City Department of Correction facility in Manhattan for three days until he posted bail.  (Pl. Dep. Submission A 59:5–60:6.)

Within a few days of Plaintiff's arrest, Detective Sager called the complainant to inform her of the arrest and learned that the complainant had moved to Massachusetts and could not return to New York to testify before a grand jury.  (Detective Sager Dep. Submission A 214:16–22, 217:7–218:10.)  Shortly after learning of the complainant's unavailability to testify before a

grand jury, Detective Sager communicated this information to the Assistant District Attorney ("ADA") handling the criminal case against Plaintiff. (Detective Sager Dep. Submission A 214:10–215:17.) Detective Sager did not recall whether he brought to the ADA's attention the discrepancies between the complainant's initial description of the alleged perpetrator and Plaintiff's appearance, but the ADA had a copy of the NYPD Complaint, which included the complainant's description of the alleged perpetrator. (Detective Sager Dep. Submission B 231:16–25; Detective Sager Dep. Submission C 232:1–20.) The District Attorney's Office datasheet created sometime around the date of Plaintiff's arrest indicates that the complainant identified the alleged perpetrator in the surveillance video and later identified Plaintiff as the alleged perpetrator. (District Attorney Datasheet, Docket Entry No. 28-3.)

On April 21, 2015, 179 days after Plaintiff's arrest and arraignment, the District Attorney dismissed the charges against Plaintiff.[16] (Certificate of Disposition, Docket Entry No. 25-14.)

## II. Discussion

### a. Standard of review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Davis v. Shah*, 821 F.3d 231, 243 (2d Cir. 2016); *see also Cortes v. MTA NYC Transit*, 802 F.3d 226, 230 (2d Cir. 2015). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010);

---

[16] Plaintiff returned to court approximately five times after he was released on bail. (Pl. Dep. Submission A 60:11–15.)

and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b. Claims against Detective Sager

Plaintiff brings three claims against Detective Sager under section 1983, alleging that Detective Sager (1) violated his Fourth Amendment rights by arresting him without probable cause, (2) violated his Fourth Amendment rights by detaining and maliciously prosecuting him, and (3) violated his Fourteenth Amendment right to due process by fabricating evidence. (Compl. ¶¶ 26–33.) In addition, Plaintiff brings New York State law claims against Detective Sager for malicious prosecution and violating his right to a fair trial.[17] (*Id.* ¶¶ 49–61.) Defendants move for summary judgment on all of Plaintiff's claims. (Defs. Mem. 5–18.)

Under section 1983, individuals may bring a private cause of action against persons "acting under color of state law" to recover money damages for deprivations of their federal or constitutional rights. *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 55 (2d Cir. 2014) (quoting 42 U.S.C. § 1983). To establish a viable section 1983 claim, a plaintiff must show "the violation

---

[17] As further discussed below, the elements of state and federal malicious prosecution claims are substantially the same, and therefore the Court discusses the state and federal malicious prosecution claims against Detective Sager under the section 1983 framework. *See Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003) ("The elements of . . . malicious prosecution under § 1983 are substantially the same as the elements under New York law. Therefore, the analysis of the state and the federal claims is identical." (citation and internal quotation marks omitted)); *accord Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003).

of a right secured by the Constitution and laws of the United States" and that "the alleged deprivation was committed by a person acting under color of state law." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87–88 (2d Cir. 2015) (citations and internal quotation marks omitted).

### i. False arrest claim

Defendants argue that the Court should dismiss Plaintiff's false arrest claim because Detective Sager had probable cause to arrest Plaintiff. (Defs. Mem. 7–10.) Plaintiff argues that the information possessed by Detective Sager prior to arresting Plaintiff was insufficient to establish probable cause. (Pl. Opp'n 7–15.)

### 1. Probable cause based on a victim's complaint

The Fourth Amendment protects individuals from unreasonable searches and seizures by law enforcement officials. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). A law enforcement official violates the Fourth Amendment's protections if he or she arrests someone without probable cause. *Id.* Conversely, "probable cause is an absolute defense to a false arrest claim." *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (quoting *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 139 (2d Cir. 2010)). "A police officer has probable cause for an arrest when he has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime . . . .'" *Swartz v. Insogna*, 704 F.3d 105, 111 (2d Cir. 2013) (quoting *Weyant*, 101 F.3d at 852); *Gonzalez*, 728 F.3d at 155 (same). The reviewing court "must consider [only] those facts available to the officer at the time of the arrest and immediately before it." *Stansbury*, 721 F.3d at 89 (alteration in original) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)). The question is whether the facts known to the

arresting officer, at the time of the arrest, objectively provided probable cause to support the arrest. *Gonzalez*, 728 F.3d at 155.

It is well-established that a law enforcement officer has "probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth." *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir. 2000); *see also Fabrikant v. French*, 691 F.3d 193, 216 (2d Cir. 2012) ("A law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity." (alterations and citations omitted)); *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) ("An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity."); *see, e.g.*, *Williams v. City of New York*, 683 F. App'x 57, 59 (2d Cir. 2017) (holding that "the circumstances known to the arresting officers in each of the three arrests did not 'raise doubts as to [the victim's] veracity' such that the officers were unjustified in relying on [the victim's] accusations" as the basis for probable cause (quoting *Singer*, 63 F.3d at 119)). Victims, in particular, are among the most reliable informants because they can provide a "first-hand non-hearsay account of the criminal activity." *Campbell v. Giuliani*, No. 99-CV-2603, 2001 WL 91615, at *3 (E.D.N.Y. Jan. 24, 2001) (citing *Miloslavsky v. AES Engineering Soc'y*, 808 F. Supp. 351, 355 (S.D.N.Y. 1992)); *see also Miloslavsky*, 808 F. Supp. at 355 ("The veracity of citizen complaints who are the victims of the very crime they report to the police is assumed.").

Absent "circumstances that raise doubts as to the victim's veracity, a victim's identification is typically sufficient to provide probable cause." *Keith v. City of New York*, 641 F. App'x 63, 65 (2d Cir. 2016) (internal quotation marks omitted) (quoting *Stansbury*, 721 F.3d at 90). Identification of a suspect in a photographic array will also establish probable cause provided the circumstances do not cast doubt on the reliability of the identification. *See Stansbury*, 721 F.3d at 91 n.5 (explaining that identifications from photographic arrays are entitled to the same reliability as in-person identifications by citizen informants (citations omitted)); *Norwood v. Mason*, 524 F. App'x 762, 765 (2d Cir. 2013) ("New York courts routinely hold that a victim's photo identification of a person provides the police with probable cause to arrest that person, even where the identification may not be 100% reliable." (first citing *People v. Radcliffe*, 808 N.Y.S.2d 22, 23 (App. Div. 2005); and then citing *People v. Jones*, 2 N.Y.3d 235, 238, 239 (2004))); *Williams v. City of New York*, No. 14-CV-7158, 2016 WL 3194369, at *4 (S.D.N.Y. June 7, 2016) ("Absent circumstances that cast doubt on the reliability of an identification, such as an unduly suggestive procedure, 'positive photo identification by an eyewitness is normally sufficient to establish probable cause to arrest.'" (quoting *Celestin v. City of New York*, 581 F. Supp. 2d 420, 431 (E.D.N.Y. 2008))). In contrast to the more demanding standard of whether evidence of an identification lacks "indicia of reliability" employed to determine the admissibility of an identification in a criminal trial, for "the purposes of determining whether an identification can support probable cause, the basic question is whether the identification procedure was 'so defective that probable cause could not reasonably be based upon it.'" *Stansbury*, 721 F.3d at 91 n.7 (quoting *Jenkins v. City of New York*, 478 F.3d 76, 93 (2d Cir. 2007)).

## 2. Detective Sager had probable cause to arrest Plaintiff

Defendants argue that the Court should dismiss Plaintiff's false arrest claim because Detective Sager had probable cause to arrest Plaintiff for grand larceny in the fourth degree and for jostling based on (1) the complainant's May 20, 2014 identification of Plaintiff as the individual who stole her wallet, and (2) the complainant's statements that she was a victim of pickpocketing on May 13, 2014. (Defs. Mem. 7–10.) Plaintiff argues that Detective Sager lacked probable cause to arrest him because (1) Detective Sager's conduct leading up to the complainant's identification of Plaintiff tainted the identification, and (2) the complainant's statements to the police regarding the pickpocketing were incredible. (Pl. Opp'n 7–15.) The Court addresses each argument in turn, and as discussed further below, finds that the totality of the evidence possessed by Detective Sager prior to arresting Plaintiff gave Detective Sager probable cause to arrest Plaintiff.

In addressing a section 1983 claim for false arrest, courts look to "the law of the state in which the arrest occurred" to determine if the officers had probable cause to arrest the plaintiff for a violation of state law. *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19–21 (2d Cir. 2012) (analyzing whether the plaintiff's actions gave a police officer probable cause to arrest the plaintiff for violating state law). Under New York law, a person is guilty of grand larceny in the fourth degree when, among other things:

> he steals property [with intent to deprive another of property or to appropriate the same to himself or a third person] and when [in relevant part] . . . (4) [t]he property consists of a credit card or debit card; or (5) [t]he property, regardless of its nature and value, is taken from the person of another . . . .

N.Y. Penal Law §§ 155.05, 155.30(4)–(5). A person is guilty of jostling "when, in a public place, he intentionally and unnecessarily: (1) [p]laces his hand in the proximity of a person's

17

pocket or handbag; or (2) [j]ostles or crowds another person at a time when a third person's hand is in the proximity of such person's pocket or handbag." N.Y. Penal Law § 165.25.

### A. Detective Sager's conduct did not taint the identification procedure

Plaintiff argues that the identification was tainted because once Detective Sager became aware that Plaintiff had previously committed larceny in the Times Square area, he decided that Plaintiff was the alleged perpetrator and led the complainant to falsely identify Plaintiff by allowing the complainant to view the video of her interaction with the alleged perpetrator prior to identifying Plaintiff. (Pl. Opp'n 12–15.) This argument is not supported by any facts and is therefore unpersuasive.

The complainant's identification of Plaintiff was not tainted by her review of the surveillance footage. At least one New York State appellate court has rejected the argument that viewing video surveillance of the events surrounding or depicting an alleged crime taints an otherwise proper identification of a defendant.[18] *See In re Lamar*, 52 N.Y.S.3d 357, 358 (App. Div. 2017) (holding that a photographic array identification was not tainted by the victim's prior identification of the perpetrator in a surveillance video tape, which the victim confirmed showed the perpetrator following her into her apartment building immediately before the crime occurred). Rather, review of surveillance evidence is considered merely "ratifying the events as

---

[18] Under the same logic, a similar line of cases held that viewing surveillance video of a crime is not an identification procedure that requires notice to the suspect under state law. *See People v. Gee*, 99 N.Y.2d 158, 162 (2002) (holding that viewing a videotape in order to confirm that it depicted the perpetrator robbing her was not an identification procedure that required providing notice under New York State law); *People v. Lara*, 13 N.Y.S.3d 74, 76 (App. Div. 2015) ("Although the video only showed the very beginning of the events leading up to the crime, rather than the crime itself, the victim's viewing of the video did not constitute an identification requiring notice, because the victim, who was depicted together with [the] defendant in the relevant portion, was 'simply ratifying the events as revealed in the videotape' rather than selecting [the] defendant as the perpetrator.").

revealed in the videotape." *In re Lamar*, 52 N.Y.S.3d at 358 (citations omitted); *see also People v. Gee*, 99 N.Y.2d 158, 162 (2002) ("Unlike line-ups or photo arrays, in which the defendant's identity is at issue, the clerk was not presented with a group of individuals (one of whom the police suspected of the crime) and asked to make an identification. . . . Here, the only person the clerk could possibly confirm to be the robber was the person on the videotape who was concededly in the process of robbing her.").

There is no basis for the Court to conclude that the complainant's review of the video with Detective Sager suggests that Detective Sager improperly encouraged the complainant to identify Plaintiff as the alleged perpetrator or that the complainant's identification was "'so defective that probable cause could not reasonably be based upon it.'" *Stansbury*, 721 F.3d at 91 n.7 (quoting *Jenkins*, 478 F.3d at 93). The complainant viewed the video as part of the investigation into the events of which she was a victim rather than for the purpose of making an identification, *Gee*, 99 N.Y.2d at 162, and, at most, the surveillance footage would only encourage the complainant to identify the alleged perpetrator if the video showed that she interacted with the alleged perpetrator as she had previously reported. *See, e.g.*, *Creighton v. City of New York*, No. 12-CV-7454, 2017 WL 636415, at *27 n.34, *31 (S.D.N.Y. Feb. 14, 2017) (rejecting the plaintiff's argument that a defendant fabricated evidence to support probable cause by coaching a confidential informant to identify a suspect because "[t]he surveillance footage would only induce the [confidential informant] to identify [the] [p]laintiff as the source of the gun if the footage showed [the plaintiff] handing a gun to his brother").

At most, the complainant's viewing of the surveillance video and the subsequent request from Detective Sager that the complainant return to the station to view a photographic array, (Detective Sager Dep. Submission A 142:5–10), may have suggested to her that the alleged

perpetrator was one of the men depicted in the photographic array. However, the suspicion or even outright knowledge that a suspect is included in a photographic array is not enough to taint an identification. *See Jenkins*, 478 F.3d at 92–93 ("This Court similarly has held that although the police generally should refrain from informing a witness that the suspect is in the lineup, a lineup is not unduly suggestive merely because they do so." (citation omitted)); *United States v. Quashie*, 162 F. Supp. 3d 135, 140 (E.D.N.Y. 2016) ("[T]he law is clear that although it may not reflect best police practices, it is not unduly suggestive for a police officer conducting a lineup to let the witness know that the person suspected of the crime is in fact in the lineup."); *People v. Green*, 789 N.Y.S.2d 184, 185 (App. Div. 2005) ("When a complainant is brought to a police station to view a lineup, it is implicit that the lineup will contain at least one suspect, otherwise there would be no point [] in conducting the lineup." (internal citation and quotation marks omitted)).[19]

---

[19] Plaintiff also appears to argue that Detective Sager fabricated evidence to establish probable cause by encouraging the complainant to report her wallet as stolen instead of lost and by falsely asserting that the complainant said that she saw her red wallet in the alleged perpetrator's hand in the video. (*See* Pl. Opp'n 13–15.) Plaintiff has not provided any evidence to support these arguments or to suggest that Detective Sager had an improper motive, and, in the absence of any such evidence, Plaintiff fails to create a disputed issue of fact or a legal basis to question whether Detective Sager had probable cause. Plaintiff cannot defeat a motion for summary judgment by relying on speculative assertions, and, in any event, Detective Sager's subjective intent is irrelevant to whether there was probable cause to arrest Plaintiff. *See Fappiano v. City of New York*, 640 F. App'x 115, 119 (2d Cir. 2016) (holding that "speculation and a tortured interpretation" of a defendant's deposition to infer that the defendant "suggested to the victim that she had selected the correct 'suspect'" during a photographic array were not enough to undermine the otherwise sound identification procedure supporting probable cause); *Fabrikant v. French*, 691 F.3d 193, 217 (2d Cir. 2012) ("[A]s a matter of law, the relevant question is not the officers' subjective motivation for making an arrest, but whether objectively they had probable cause."); *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 99 (2d Cir. 2003) ("Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of material fact." (citation omitted)); *Carlisle v. City of Yonkers*, No. 96-CV-2356, 1996 WL 685756, at *2 (2d Cir. Nov. 29, 1996) ("[The plaintiff's] conclusory allegations of impropriety are insufficient to defeat a motion for summary judgment.").

In the absence of any evidence that the identification was tainted or unduly suggestive, the identification supports probable cause for Plaintiff's arrest. *See Norwood*, 524 F. App'x at 765 ("New York courts routinely hold that a victim's photographic identification of a person provides the police with probable cause to arrest that person, even where the identification may not be 100% reliable." (first citing *Radcliffe*, 808 N.Y.S.2d at 23; and then citing *Jones*, 2 N.Y.3d at 238, 239)); *Alvarado v. City of New York*, 453 F. App'x 56, 58 (2d Cir. 2011) (holding that victim's identification of the plaintiff in a photographic array and line-up satisfied probable cause); *Jones*, 2 N.Y.3d at 237–38 (holding that the photographic array identification by two robbery victims supported probable cause for an arrest); *Rush v. Astacio*, No. 97-CV-2661, 1998 WL 480751, at *1 (2d Cir. July 31, 1998) (holding that the uncontested fact that the plaintiff was identified by the crime victim in a photographic array establishes probable cause as a matter of law); *Carlisle v. City of Yonkers*, No. 96-CV-2356, 1996 WL 685756, at *2 (2d Cir. Nov. 29, 1996) (holding that a victim's identification of suspect from six-person computer-generated photographic array was sufficient to establish probable cause absent police impropriety or proof that the photographic array was improperly suggestive).

## B. The complainant reliably reported the pickpocketing

In arguing against probable cause, Plaintiff makes several arguments concerning the trustworthiness of the complainant, which, when considered in totality, are insufficient to create a triable issue of material fact. (Pl. Opp'n 9–15.) Plaintiff argues that the circumstances surrounding the complaint compromised the complainant's credibility, namely that: (1) the complainant waited two hours before reporting the crime, (2) the complainant offered varying degrees of detail between her interviews with NYPD officers, (3) the complainant's prior physical description of the alleged perpetrator did not match Plaintiff's physical characteristics,

and (4) the video evidence contradicts the complainant's statement as to her interaction with the alleged perpetrator. (*Id.* at 11–12.)

A victim's otherwise reliable statement might be called into question if facts known to the officer suggests a reason to distrust her honesty. *See McGee v. Doe*, 568 F. App'x 32, 37–38 (2d Cir. 2014) (reversing a district court's grant of qualified immunity on a motion to dismiss where "any reasonably competent officer should have known that [the victim-informant] was an unreliable victim-informant whose statement, under the circumstances, could not form the sole basis for an arrest").

A victim's delay in reporting a crime can be an indication of unreliability. *See Cornett v. Brown*, No. 04-CV-754, 2007 WL 2743485, at *6 (E.D.N.Y. Sept. 17, 2007) (stating that a "complainant's delay in reporting a crime is a factor for determining the complainant's truthfulness" and is thus relevant to the court's probable cause determination (collecting cases)). However, where the delay is brief or there is a logical explanation for the delay that is known to the officer, the delay does not necessarily render a victim's otherwise reliable statement incredible. *See Williams v. City of New York*, No. 14-CV-2191, 2016 WL 9022589, at *5 (E.D.N.Y. Mar. 24, 2016) (finding a delay of five months did not undermine the credibility of a complainant, particularly because the plaintiff was reporting a crime by her own relative) *aff'd* 683 F. App'x 57 (2d Cir. 2017); *Nabatkhorian v. County of Nassau*, No. 12-CV-1118, 2013 WL 1233247, at *9 (E.D.N.Y. Mar. 27, 2013) (discussing that in certain cases a delay in reporting may be explainable because a victim may be fearful of disclosing the name of an attacker); *Cyrus v. City of New York*, No. 06-CV-4685, 2009 WL 10676441, at *3 (E.D.N.Y. Feb. 9, 2009) ("The three-day delay in reporting the complaint, without any other indication that [the victim] was unreliable, did not provide any reason for [the officer] to doubt her.").

In addition, while vastly inconsistent statements by a victim might undermine the victim's reliability, minor inconsistent statements do not automatically vitiate probable cause based solely on a victim's statements if the totality of the circumstances support probable cause. *See Crawford v. City of New York*, 477 F. App'x 777, 779 (2d Cir. 2012) ("The supposed inconsistencies in some of the [victims'] statements as to the details and precise dates of the assaults are minor discrepancies that do not negate probable cause, much less establish bad faith on the part of authorities."); *Fogelman v. Donato*, 111 F. Supp. 3d 282, 285 (E.D.N.Y. 2015) ("[A] putative victim's inconsistent statements [do not] necessarily vitiate probable cause."); *Gisondi v. Town of Harrison*, 72 N.Y.2d. 280, 285 (1988) ("In any investigation the police are likely to encounter discrepancies, particularly in cases involving eyewitness identification. These matters may impair their ability to prove guilt beyond a reasonable doubt at trial, but they generally have little bearing at preliminary stages where the only relevant concern is whether there is sufficient evidence to show probable cause to believe the defendant committed the crime."); *People v. Pelzer*, 982 N.Y.S.2d 316, 316 (App. Div. 2014) ("The discrepancies between defendant's appearance and the victim's description of the burglar were not so significant as to undermine probable cause under the totality of circumstances.").

If a witness' reliability is questioned, courts should consider whether a witness' statements are supported by information obtained as part of an independent police investigation. *See McGee*, 568 F. App'x at 38 ("We must consider in combination the facial weaknesses of [the complainant's] statement with all of the other information possessed by the police defendants before making the arrest."); *United States v. Gagnon*, 373 F.3d 230, 236 (2d Cir. 2004) ("In addition to considering an informant's veracity, reliability, and basis of knowledge, in assessing the totality of the circumstances we also evaluate whether the information an informant provides

is corroborated by independent police investigation."); *Creighton*, 2017 WL 636415, at *28 (explaining that where a confidential informant's description of events had been called into question, the officers were required to consider whether there was corroborating evidence for the informant's report, including surveillance footage of the alleged incident).

First, Plaintiff argues that Detective Sager could not rely on the complaint made by the complainant to establish probable cause because the complainant waited two hours after the incident to file a complaint. (Pl. Opp'n 9, 11–12.) Despite the fact that the complainant only had to travel a distance of several blocks from West 45th Street and Broadway, where the crime occurred, to the NYPD Substation at West 43rd Street and Seventh Avenue, (Detective Sager Dep. Submission B 224:19–225:25), the two hour delay between when the crime occurred between 4:30 and 4:45 PM and approximately 6:40 PM when the complainant first reported the crime, (NYPD Report at 1; Detective Sager Dep. Submission B 224:4–13), is not a delay of sufficient length to discount her credibility. Under the circumstances, the delay was only a matter of hours, not days, as in many cases finding a delay indicative of veracity. The Court finds no reason to infer that the complainant was not truthfully reporting the pickpocketing because she did not do so instantaneously. *See, e.g.*, *Cyrus*, 2009 WL 10676441, at *3; *cf. Bullard v. City of New York*, 240 F. Supp. 2d 292, 298 (S.D.N.Y. 2003) (finding that a several-week delay in a victim's report of an alleged crime "raises questions as to the legitimacy of the complaints" for purposes of determining probable cause).

Second, Plaintiff argues that the complainant was unreliable because she offered varying degrees of detail between her interviews with NYPD officers. (Pl. Opp'n 9–10.) The general information about the incident told to Officer Mitchell, and the more detailed information provided first to the investigator and then Detective Sager, do not undermine the complainant's

reliability.  In making the complaint to Officer Mitchell, the complainant gave a very general description of the incident: she explained that someone "brushed against" her and "upon further investigation" she realized that she did not have her wallet, but she did not definitively assert that her wallet had been stolen.  (NYPD Compl. at 2; Officer Mitchell Dep. Submission B 52:6–53:24.)  The complainant also did not provide Officer Mitchell with any identification information of a potential suspect.  (Officer Mitchell Dep. Submission B 46:2–17, 53:7–53:24; NYPD Compl. at 2.)  In speaking to the investigator sometime after speaking to Officer Mitchell, the complainant gave a more detailed explanation of the incident: she felt a male, whose physical features she described, "reach into her [unzipped] purse" and remove her wallet and she confronted him but he told her that he had not taken her wallet and that the man who had taken it had fled.  (NYPD Compl. at 2; Officer Mitchell Dep. Submission B 46:1–25, 49:1–50:11.)  In speaking to Detective Sager three days after the incident, the complainant gave a description of the events consistent with what she had told the investigator: she felt someone "digging around in her bag" and realized her wallet was missing so she confronted a man standing beside her, whose physical features she described and who told her that another person took her wallet as he pointed behind the complainant and then walked away while the complainant looked in the direction in which he had pointed.  (Detective Sager Dep. Submission A 77:12–17, 77:22–78:3, 78:10–23, 79:13–80:5, 80:14–17, 93:5–18; Detective Sager DD5s at 2.)

Although in the initial encounter with Officer Mitchell the complainant did not explicitly tell Officer Mitchell that her wallet was stolen, did not offer a description of the man she interacted with or mention interacting with a man, and was uncertain about whether someone

reached into or acted suspiciously around her purse,[20] the complainant later described to the investigator and Detective Sager that the man took her wallet from her purse, (NYPD Compl. at 2; Detective Sager DD5s at 2), and she provided consistent descriptions of the alleged perpetrator as a white thirty year-old Hispanic man who was approximately six feet tall and weighed 180 pounds,[21] (NYPD Compl. at 2), and a skinny white or white Hispanic man in his mid-to-late thirties, approximately six feet tall, and possibly wearing a khaki shirt, (Detective Sager DD5s at 2), respectively. The fact that she did not include all the details of the pickpocketing incident in her first report to Officer Mitchell, but later provided more detail, does not by itself suggest that she was not being truthful, especially where, but for the lack of statements indicating her wallet was stolen and her later statements describing a man reaching into her purse, there was no discrepancy between the initial recorded statement and later recorded statements, and the two later statements were consistent with one another. Officer Mitchell's recollection that the complainant did not know whether anyone reached into her purse or acted suspiciously around her does not undermine probable cause because Detective Sager relied on the NYPD Complaint in his investigation and Officer Mitchell did not include the complainant's uncertainty in the complaint. (*See* NYPD Complaint.) The complainant consistently reported during each of her interviews that she felt some form of contact with her

---

[20] At his deposition, Officer Mitchell said that the complainant did not clearly state that she was a victim of a crime, did not say anything about a male perpetrator and, in response to Officer Mitchell's question as to whether she "observed anybody going into or acting suspiciously around her [] shoulder bag," she answered that "she didn't know." (Officer Mitchell Dep. Submission B 52:6–53:24.)

[21] The only inconsistency between the physical descriptions the complainant offered to the investigator and Detective Sager is that she told the investigator that the alleged perpetrator had short brown hair but there is no information about the alleged perpetrator's hair in Detective Sager's reports. (*Compare* NYPD Complaint 2–3 *with* Detective Sager DD5s.)

purse and/or body and later realized her wallet was missing, and in her second and third descriptions of the incident, she consistently described the alleged perpetrator and her interaction with him. *See, e.g.*, *Romney v. Black*, No. 14-CV-4512, 2017 WL 1317011, at *7 (E.D.N.Y. Mar. 31, 2017) (finding a victim's on-the-scene statement that he was stabbed by three men and his later sworn statement that he was stabbed by the plaintiff, although inconsistent, did not undermine probable cause to arrest the plaintiff based on the victim's statement); *O'Brien v. City of Yonkers*, No. 07-CV-3974, 2013 WL 1234966, at *10 (S.D.N.Y. Mar. 22, 2013) (collecting cases in which witnesses' statements contributed to probable cause determinations despite inconsistencies in those statements).

Even when considered together, the delay in reporting the incident and the inconsistencies between the complainant's initial complaint to Officer Mitchell and her later interviews, would not lead a reasonable officer to question the complainant's veracity.

Third, Plaintiff argues that the complainant's initial description of the alleged perpetrator was so inconsistent with Plaintiff's description that it should have undermined her credibility. (Pl. Opp'n 11–12.) There is no dispute that the claimant initially described the alleged perpetrator as a white Hispanic man, approximately thirty years old with short brown hair, who was approximately six feet tall, weighed 180 pounds and was wearing a beige or khaki shirt, (NYPD Compl. at 2–3; Detective Sager DD5s at 2), but later identified Plaintiff as the alleged perpetrator; Plaintiff has a "brown skin" complexion and, at the time of the incident was forty-eight years old, bald, five feet four inches tall and weighed 150 pounds. (Pl. Dep. Submission A 19:17–20:14, 22:4–8.) The discrepancy of eight inches in height, whether the

alleged perpetrator had no hair or short hair,[22] and the alleged perpetrator's complexion, do not undermine the reliability of the complainant's later identification, particularly where her description was within the bounds of Plaintiff's weight and age, and her identification of Plaintiff from the photographic array was unequivocal. *See, e.g.*, *Norwood*, 524 F. App'x at 765 (holding that an identification of an African-American man as the perpetrator by two victims satisfied probable cause despite their initial description that the perpetrator was Hispanic, where the descriptions were otherwise consistent as to height, age, weight and facial hair); *Stansbury*, 721 F.3d at 94 (An officer had probable cause to defeat a false arrest claim based on an investigation and identification of the plaintiff, even though, "the only exculpatory evidence is a guess from a store employee [who witnessed the crime] as to the perpetrator's height that was off by four inches. This deficiency, if it was one, was overcome by other evidence, including a positive, sworn identification by the same employee."); *Caceres v. Port Auth. of N.Y. & N.J.*, 631 F.3d 620, 623 (2d Cir. 2011) (holding that "a reasonable officer" would have probable cause to arrest the plaintiff despite the skin color and race discrepancies in the warrant description because the plaintiff's "height, weight, age, hair color and eye color were either accurate or within bounds").

Fourth, Plaintiff argues that the video evidence contradicts the complainant's statement as to what happened because it does not show her searching her purse for her wallet as she said that she did, and because the complainant watches the alleged perpetrator walk away, which contradicts her statement that the alleged perpetrator "vanished" after pointing her in the direction of someone else. (Pl. Opp'n 10–11.)

---

[22] It is not clear that the complainant identified any hair type when she described the alleged perpetrator to Detective Sager. (Detective Sager DD5s at 2; Mugshot Viewing Report and Witness Summary.)

Having reviewed the video evidence, the Court finds that the video corroborates the material portions of the complainant's statements about the incident. At the beginning of the video, the complainant is searching her purse while conversing with the alleged perpetrator. (Video.) The alleged perpetrator points the complainant in the direction of someone else, backs away from the complainant, and then turns away from her and walks away. (Video.) The complainant hesitates but then walks in the direction pointed to by the alleged perpetrator. (Video.) The slight difference between the depiction of events in the video and the complainant's initial report that she turned to look in the direction the alleged perpetrator was pointing and then the alleged perpetrator disappeared, (Detective Sager Dep. Submission A 77:22–78:3; Detective Sager DD5s at 2), are not the type of inconsistencies that a reasonable officer would consider as a basis for finding the complainant incredible, especially in view of the fact that the video shows the alleged perpetrator walking away from the complainant almost immediately after pointing the complainant in a different direction.[23]

---

[23] The Court agrees with Plaintiff that, other than Detective Sager's testimony that the complainant identified the object in the alleged perpetrator's hand as her red wallet, (Detective Sager Dep. Submission A 93:19–24, 127:23–128:14), the record is not clear as to whether the alleged perpetrator was holding the complainant's wallet in his left hand or whether the wallet was red. (Pl. Opp'n 14.) According to the video, the object in the alleged perpetrator's hand more closely resembles a hat than a wallet, though the video is not clear enough to make a definitive determination. (Video.) It also appears that when the alleged perpetrator and the complainant enter the frame of the video, the alleged perpetrator is holding the red object in the hand closest to the complainant where she could see it. (Video.) The alleged perpetrator also brings both of his hands to his chest at one point during the video, providing another opportunity for the complainant to have seen the red object in his hand. (Video.) But there is no indication in the record that the complainant saw the wallet in the alleged perpetrator's hand at the time of the incident, which makes the complainant's later claim that in the video she saw her wallet in the alleged perpetrator's hand questionable. In addition, the complaint identifies the missing wallet as "brown/tan pattern" and not red as the complainant purportedly told Detective Sager. (NYPD Compl. at 4.)

Despite the uncertainty of whether the complainant's wallet was in the alleged perpetrator's hand, Detective Sager's testimony that the complainant identified her wallet in the

The video also corroborates the complainant's photographic array identification.  The surveillance video confirms that the complainant was mistaken about the alleged perpetrator's hair type and height when she initially told the Crime Analysis investigator that the alleged perpetrator had short hair and was approximately six feet tall.  (NYPD Compl. at 2–3; Detective Sager DD5s at 2.)  The video shows that the alleged perpetrator, like Plaintiff, was bald and closer to the complainant's height, which Detective Sager estimated as between five feet two inches and five feet eight inches tall.  (Video; Detective Sager Dep. Submission A 101:9–25.)

The video also corroborates that the complainant accurately identified that the alleged perpetrator wore a beige or khaki shirt.  The video shows the alleged perpetrator was wearing a light colored shirt, though the investigator noted that the alleged perpetrator was wearing a "t-shirt or tank top" and the video shows the alleged perpetrator wearing a long-sleeved shirt. (Video; NYPD Report at 3.)

---

alleged  perpetrator's hands after watching the surveillance footage, and Detective Sager's testimony that the complainant told him her wallet was red, (Detective Sager Dep. Submission A 93:12–23, 127:23–128:14), viewing the facts in Plaintiff's favor — that the complainant's wallet was not red and the video does not show the complainant's wallet in the alleged perpetrator's hands — the record nevertheless includes facts sufficient to establish probable cause for the alleged perpetrator's arrest based on the complainant's report that the alleged perpetrator put his hand in her purse and then her wallet was missing and her subsequent identification of Plaintiff as the alleged perpetrator.  *See Fabrikant*, 691 F.3d at 216 ("A law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity." (alterations and citations omitted)); *see also People v. McFarlan*, 744 N.Y.S.2d 287, 290 n.7 (Cty. Ct. 2002) ("The crime of jostling does not necessarily entail the successful picking of a pocket."); *People v. Lynn*, 454 N.Y.S.2d 585, 586 (App. Term 1982) ("Jostling itself is an inchoate theft offense, aimed at the pickpocket who surreptitiously attempts to secure the personal property of his victim.  It is in the nature of an attempt.  As such, there can be no such crime as attempted jostling." (citations omitted)).  Viewing the complainant's wallet in the video may have enhanced the basis for probable cause, but neither the lack of video surveillance of the complainant's wallet in the alleged perpetrator's hands nor the color of the complainant's wallet undermine probable cause.

Accordingly, even if the complainant's reliability or credibility was questionable, the surveillance video corroborated the complainant's interaction with the alleged perpetrator immediately after the incident and shows that the alleged perpetrator resembled Plaintiff and therefore supports the reasonableness of Detective Sager's reliance on the complainant as the basis for establishing probable cause. (Video); *see, e.g.*, *Williams*, 2016 WL 3194369, at *4–5 (rejecting the plaintiff's argument that the witness' version of the facts was inconsistent with the surveillance video, because based on the court's review of the video, "the security camera footage bolster[ed] [the witness'] credibility as an eyewitness, thereby making [the] [d]efendants' reliance on [the witness] as a basis for establishing probable cause more, rather than less, objectively reasonable").

### C. The totality of the circumstances known to Detective Sager prior to arresting Plaintiff provided Detective Sager with probable cause to arrest Plaintiff

Although the Court rejects Plaintiff's arguments that Detective Sager tainted the complainant's identification of Plaintiff and that the complainant's statements were unreliable, the Court must nevertheless address Defendants' argument that Detective Sager had probable cause to arrest Plaintiff for grand larceny in the fourth degree and jostling. (Defs. Mem. 9–10.)

Under New York law, a person is guilty of grand larceny in the fourth degree when, among other things:

> he steals property [with intent to deprive another of property or to appropriate the same to himself or a third person] and when [in relevant part] . . . (4) [t]he property consists of a credit card or debit card; or (5) [t]he property, regardless of its nature and value, is taken from the person of another . . . .

N.Y. Penal Law §§ 155.05, 155.30(4)–(5). A person is guilty of jostling "when, in a public place, he intentionally and unnecessarily: (1) [p]laces his hand in the proximity of a person's

pocket or handbag; or (2) [j]ostles or crowds another person at a time when a third person's hand is in the proximity of such persons' pocket or handbag."  N.Y. Penal Law § 165.25.

Considering the complainant's consistent description of the incident during each of her interviews that she felt some form of contact with her purse and/or body and later realized her wallet was missing, her explanation to the investigator and Detective Sager that the only person next to her after the contact was the alleged perpetrator who told her that a different person took her wallet, pointed her in the direction of that person and then walked away, and the video surveillance corroborating that the complainant interacted with a man after looking through her purse, a reasonable officer would have been justified in the belief that the man with whom the complainant interacted "intentionally and unnecessarily" either placed "his hand in the proximity of" the complainant's unzipped purse or "jostle[d] or crowd[ed]" the complainant "at a time when a third person's hand is in the proximity of" the complainant's unzipped purse in violation of New York Penal Law section 165.25 and that he had stolen the complainant's property including her credit and debit cards in violation of New York Penal Law section 155.30(4)–(5).[24] N.Y. Penal Law §§ 155.30, 165.25; *Fabrikant*, 691 F.3d at 216 ("A law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity." (alterations and internal quotation marks omitted)); *Lee v. Corneil*, No. 13-CV-8359, 2016 WL 1322444, at *3 (S.D.N.Y. Apr. 1, 2016) (dismissing a claim for false arrest on a grand larceny in

_____

[24]  Defendants are not required to establish that Detective Sager had probable cause to arrest Plaintiff for both jostling and grand larceny in the fourth degree in order to defeat Plaintiff's false arrest claim.  Probable cause for either crime defeats any false arrest claim.  *See Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) (noting that to determine whether probable cause existed "it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest").

the fourth degree charge on a Rule 12(b)(6) motion because the officer had probable cause after he viewed the alleged pickpocketing on a surveillance video tape and was able to identify the plaintiff from the tape); *People v. McFarlan*, 744 N.Y.S.2d 287, 290 (Cty. Ct. 2002) (finding probable cause for the defendant's arrest where a citizen-informant identified the perpetrator that she witnessed commit a pickpocket in a photographic array); *id.* 290 n.5 ("The crime of jostling does not necessarily entail the successful picking of a pocket.").

A reasonable officer would also have been justified in the belief that Plaintiff was the alleged perpetrator because the complainant identified Plaintiff as the "one who took [her] wallet" in a photographic array devoid of any evidence of undue suggestibility.[25]  (Detective Sager DD5 at 6.)  Under these circumstances, the identification was reliable, as Detective Sager had no reason to doubt the complainant's honesty, and there is no evidence in the record that Detective Sager was aware of any ill incentive for the complainant to identify Plaintiff as the alleged perpetrator since the two did not know each other prior to the pickpocketing.  *See, e.g.,*

_____

[25]  Plaintiff does not challenge the photographic array as unduly suggestive and indeed there would be no basis for Plaintiff to make such an argument.  Each of the individuals pictured in the photographic array were of similar appearance as they were all bald, had facial hair and were of similar "brown" complexion to Plaintiff.  (Photo Array 273724 and Photo Array Viewing Report); *see, e.g.*, *United States v. Marsh*, 644 F. App'x 5, 7 (2d Cir. 2016) ("The array contains photographs of six African–American men of similar age, three of whom, in addition to [the defendant], have slightly longer hair.  [The defendant] and two others have gray in their hair.  Four, including [the defendant], are wearing glasses. . . . Thus, the district court's finding that 'it is a fair array depicting six black men with sufficiently similar characteristics,' was not clearly erroneous."); *Carlisle*, 1996 WL 685756, at *2 (finding that a photographic array was not improperly suggestive where it "was generated by a computer and included photographs of five persons who closely matched the victim's description of the assailant"); *Thompson v. City of New York*, 603 F. Supp. 2d 650, 657 (S.D.N.Y. 2009) (finding probable cause to defeat a false arrest claim based on a photographic array identification where all six men were "similar in appearance" to the plaintiff); *People v. Radcliffe*, 808 N.Y.S.2d 22, 23 (App. Div. 2005) (holding that a lineup identification was not unduly suggestive where the physical disparities between the individuals in a lineup were "minimal and did not draw undue attention to [the] defendant").

*Stansbury*, 721 F.3d at 91 (holding that it was reasonable to credit the eye witnesses'
identification because the officer "had no reason to doubt the honesty" of the witnesses, the
witnesses' made their statements under penalty of perjury and lacked any incentive to point out
the plaintiff as the perpetrator).

In addition, Officer Hanna's statement that the alleged perpetrator in the video resembled
Plaintiff further contributes to probable cause to arrest Plaintiff.[26] *See, e.g.*, *Stansbury*, 721 F.3d
at 88, 90 (holding that the fact that an officer "recognized [the suspect he was interviewing] as
the perpetrator he had seen on the videotape" "contribute[d] meaningfully to probable cause to
arrest" (internal quotation marks omitted)); *Creighton*, 2017 WL 636415, at *4, *27 n.34
(finding that an officer's identification of a perpetrator based on the "[officer's] experience" with
the perpetrator, the "general makeup of [the perpetrator], [and] the physical appearance" of the
perpetrator with whom he was familiar, at least contributed to probable cause, even if it was
inadequate to satisfy probable cause in the absence of other identification evidence); *Nzegwu v.
Friedman*, No. 10-CV-02994, 2014 WL 1311428, at *9 (E.D.N.Y. Mar. 31, 2014) (finding that
the officers' identification of the plaintiff, who they interviewed as matching the ATM
photographs of the suspect, supported a finding of arguable probable cause for an
arrest), *aff'd*, 605 F. App'x 27 (2d Cir. 2015).

---

[26] Though the record is not clear on how much information Detective Sager learned
about Plaintiff's prior arrest for grand larceny other than Officer Hanna's vague comment that
Plaintiff was previously arrested and Detective Sager's database check to see whether Plaintiff
was in custody prior to the photographic array, (Detective Sager Dep. Submission A 139:6–9,
141:15–142:3, 142:16–143:7), any knowledge by Detective Sager of Plaintiff's prior arrest for
grand larceny also contributed to probable cause. *See Stansbury v. Wertman*, 721 F.3d 84, 92
(2d Cir. 2013) (holding that the officers' knowledge that the grand larceny suspect had
previously been arrested for grand larceny, though it did not "individually yield[] a significant
step towards probable cause . . . [,] the district court should have considered [it] as part of the
totality of circumstances").

Accordingly, Plaintiff's false arrest claim fails as a matter of law because there was probable cause for his arrest.

## ii. Malicious prosecution claims

Defendants argue that the Court should dismiss Plaintiff's federal and state malicious prosecution claims because there was probable cause supporting Plaintiff's prosecution for grand larceny in the fourth degree and jostling, and because Plaintiff cannot demonstrate malice or favorable termination. (Defs. Mem. 10–15.) Plaintiff argues that he has proven a prima facie malicious prosecution claim under federal and state law. (Pl. Opp'n 15–19.)

"[T]o prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010) (citations and internal quotation marks omitted). Under New York law, the elements of a malicious prosecution claim are "(1) the initiation or continuation of a criminal proceeding against [the] plaintiff; (2) termination of the proceeding in [the] plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for [the] defendant's actions." *Morris v. Silvestre*, 604 F. App'x 22, 24 (2d Cir. 2015) (quoting *Manganiello*, 612 F.3d at 161); *Torres v. Jones*, 26 N.Y.3d 742, 760 (2016) ("The elements of the tort of malicious prosecution are: (1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice" (citations omitted)). In a claim for malicious prosecution under section 1983, the plaintiff must also show "that there was . . . a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. N.Y.C. Transit*

*Auth.*, 215 F.3d 208, 215 (2d Cir. 2000); *see also Coleman v. City of New York*, 688 F. App'x 56, 58 n.1 (2d Cir. 2017) ("The tort of malicious prosecution relates to deprivations of liberty pursuant to legal process — meaning either post-arraignment or as a result of [an] arrest pursuant to warrant." (citing *Singer*, 63 F.3d at 116–17)).

Because the lack of probable cause is an element of a malicious prosecution claim, "the existence of probable cause is a complete defense to a claim of malicious prosecution." *Keith*, 641 F. App'x at 67 (first quoting *Stansbury*, 721 F.3d at 90; and then citing *Torres*, 26 N.Y.3d at 761); *Morris*, 604 F. App'x at 25 (A court must separately analyze "the charges claimed to have been maliciously prosecuted" to determine whether there was probable cause for the prosecution of each charge. (quoting *Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991))); *id.* (holding that it was error for the district court to not discuss whether there was probable cause as to more serious crimes involving different elements). The existence of probable cause in a malicious prosecution suit is determined at the time the prosecution is commenced, *Rothstein v. Carriere*, 373 F.3d 275, 292 (2d Cir. 2004), and is marginally higher than the standard in false arrest cases in that it requires "such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff [is] guilty," *Stansbury*, 721 F.3d at 95 (citation omitted).

Here, there was probable cause for Plaintiff's prosecution for jostling and grand larceny in the fourth degree for substantially the same reasons discussed above. Even though the standard for probable cause to defeat a malicious prosecution claim is "slightly higher" than the standard for false arrest, a victim's identification of the alleged perpetrator and description of the alleged conduct is generally sufficient to support probable cause and defeat a malicious prosecution claim in the absence of any facts dissipating probable cause after an arrest. *See Keith*, 641 F. App'x at 67 ("Although the probable cause standard in the malicious prosecution

context is slightly higher than the standard for false arrest cases, information from an identified citizen accusing another individual of the commission of a specific crime is [generally still] sufficient to provide the police with probable cause." (citations and internal quotation marks omitted) (collecting cases)); *Stansbury*, 721 F.3d at 95 (holding that there was probable cause to defeat a malicious prosecution claim based on the "uncontroverted evidence adduced" during the investigation against the plaintiff). Plaintiff does not argue that any facts became known after Plaintiff's arrest which dissipated probable cause.

Accordingly, Plaintiff's malicious prosecution claims fail as a matter of law because there was probable cause for the prosecution. Because the Court finds that Plaintiff's malicious prosecution claims are defeated based on probable cause, the Court does not consider whether Plaintiff has established the elements of malice or favorable termination of the criminal charges.[27]

### iii. Fabrication of evidence claims

Defendants argue that the Court should dismiss Plaintiff's fabrication of evidence claims as duplicative of his malicious prosecution claims and because Detective Sager provided to the District Attorney's Office accurate and complete information about the events surrounding Plaintiff's arrest. (Defs. Mem. 18; Defs. Reply in Further Supp. of Defs. Mot. 10, Docket Entry

---

[27] At a minimum, there was arguable probable cause to arrest and prosecute Plaintiff and Detective Sager would therefore be entitled to qualified immunity, thereby prevailing on his summary judgment motion. Detective Sager's determination that Plaintiff was involved in the pickpocketing was objectively reasonable. Detective Sager had at least "arguable probable cause" because "a reasonable police officer in the same circumstances and possessing the same knowledge" as Detective Sager "could have reasonably believed that probable cause existed," *see Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007) (quoting *Cerrone v. Brown*, 246 F.3d 194, 202–03 (2d Cir. 2001)); *Williams v. City of New York*, No. 14-CV-7158, 2016 WL 3194369, at *6 (S.D.N.Y. June 7, 2016) ("The Court's determination that there was arguable probable cause to defeat William's false arrest claim also precludes his malicious prosecution claim, as Defendants are equally entitled to qualified immunity.").

No. 26.)  Plaintiff argues that Detective Sager "misled prosecutors about material facts that resulted in [P]laintiff's arrest, jailing and prosecution" by failing to disclose to the District Attorneys' Office the complainant's initial inconsistent description of the alleged perpetrator, "the manner in which [Plaintiff] came to be presented in a photo array, and [the complainant's] viewing of the video" prior to identifying Plaintiff from the photographic array.  (Pl. Opp'n 21–22.)

To establish a fair trial claim based on fabrication of evidence, a plaintiff must show that "an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result."  *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277 (2d Cir. 2016) (citation omitted); *Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)).  Unlike a false arrest or malicious prosecution claim, "probable cause is not a defense to a claim for a denial of the right to a fair trial" based on the fabrication of evidence.  *Garnett*, 838 F.3d at 277 (alteration omitted) (citing *Jovanovic*, 486 F. App'x at 152).

An investigating official may be any governmental actor that investigates alleged criminal activity, which in most cases is a police officer.  *See Garnett*, 838 F.3d at 274 ("[A] Section 1983 plaintiff may sue for denial of the right to a fair trial based on a police officer's fabrication of information."); *Ricciuti*, 124 F.3d at 130 ("When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such [] action is redressable in an action for damages under [section] 1983." (citation omitted)).  A plaintiff need only produce some evidence showing that the officer's statement or evidence is

false or manipulated. *See Garnett*, 838 F.3d at 269–70, 279 (holding that the plaintiff's and the officer's conflicting accounts of the events underlying the charges created an issue of fact as to falsity); *Morse v. Fausto*, 804 F.3d 538, 547 (2d Cir. 2015) (holding that the plaintiff's documents showing that the prosecutor omitted material portions of relevant evidence created an issue of fact on falsity); *Jocks v. Tavernier*, 316 F.3d 128, 138 (2d Cir. 2003) (holding that the plaintiff's testimony that the information was false was sufficient evidence to create an issue of fact as to falsity).

Whether the fabricated evidence is likely to influence a jury's decision can be satisfied by showing that the fabricated evidence was material to the prosecutor's case. *See Garnett*, 838 F.3d at 277 (holding that fabricated evidence is material when it may affect "the prosecutor's decision to pursue charges rather than to dismiss the complaint without further action" or could influence "the prosecutor's . . . assessments of the strength of the case"); *Ricciuti*, 124 F.3d at 129–30 (holding that fabricated evidence, such as a confession, is material because it is "almost certain to influence a jury's verdict"). Proof that a police officer forwarded the fabricated evidence to a prosecutor can be satisfied by direct evidence that the officer gave the evidence to the prosecutor or by other evidence from which it can be inferred that the officer forwarded the fabricated evidence to a prosecutor. *See Morse*, 804 F.3d at 547 (holding that it was clear that the fabricated evidence was forwarded to a prosecutor because the prosecutor used the fabricated evidence during a grand jury proceeding); *Higazy v. Templeton*, 505 F.3d 161, 177–78 (2d Cir. 2007) (holding that there was an issue of fact as to whether a police officer forwarded false information to a prosecutor because it appeared that the prosecutor relied on the false information at the plaintiff's bail hearing).

Here, Plaintiff argues that Detective Sager violated his right to a fair trial by failing to provide certain evidence to the District Attorneys' Office. Fabrication of evidence by omission is one way to establish a fabrication of evidence claim and it does not duplicate Plaintiff's malicious prosecution claims. *See Garnett*, 838 F.3d at 278 (rejecting an argument that a "claim based on falsified information is only cognizable as a claim for malicious prosecution or for false arrest under the Fourth Amendment, and not as an independent fair trial claim"); *Morse*, 804 F.3d at 548 ("Information may be 'false' if material omissions render an otherwise true statement false."); *Hicks v. City of New York*, 232 F. Supp. 3d 480, 493 n.15 (S.D.N.Y. 2017) (A "fair trial claim may be brought alongside a malicious prosecution claim, even where both claims are based on the same allegedly false evidence and the same deprivation of liberty." (quoting *Hoyos v. City of New York*, 999 F. Supp. 2d 375, 392 (E.D.N.Y. 2013))).

Nevertheless, Plaintiff's claims fail because he does not present any evidence that Detective Sager forwarded incomplete evidence to the District Attorney's Office. According to the District Attorney's Office datasheet, the District Attorney's Office was aware that the complainant viewed the surveillance video prior to identifying Plaintiff in the photographic array, (District Attorney Datasheet), and, according to the uncontested testimony of Detective Sager, at the time the prosecution was initiated, the District Attorney's Office had a copy of the complaint filed with the NYPD, which included the complainant's initial description of the alleged perpetrator, (Detective Sager Dep. Submission C 232:4–20). Therefore, as to Plaintiff's omission theory for his fabrication of evidence claims, such claims fail because the record establishes that Detective Sager did not omit any evidence when he forwarded information about Plaintiff's case to the ADA. *See generally Smolicz v. Borough of Naugatuck*, 281 F. App'x 32, 33 (2d Cir. 2008) (holding that the plaintiff's section 1983 claim for material omission in a

warrant application failed because the "[d]efendants-[a]ppellees did not omit material facts relevant to the probable cause determination"); *Creighton*, 2017 WL 636415, at *32 ("Having deposed the [confidential informant], [the] [d]etective, and countless other witnesses over the past three years, the [p]laintiff must now come forward with evidence to support his claims of fabrication. That he has not done, and speculation and innuendo are not sufficient to defeat summary judgment." (alterations and internal quotation marks omitted)); *cf. Morse*, 804 F.3d at 547 (holding that a showing of fabrication was satisfied where the plaintiff's documents showed that the prosecutor omitted material portions of relevant evidence).

As to Officer Hanna's identification of Plaintiff, which led to the inclusion of Plaintiff in the photographic array — even assuming that the information was not provided to the District Attorneys' Office, which Plaintiff has not shown — Plaintiff does not establish how the omission of that evidence would "influence a jury's decision" since the complainant identified Plaintiff as the alleged perpetrator who stole her wallet in the photographic array that was devoid of taint. *Ricciuti*, 124 F.3d at 130. Indeed, an officer's identification of a perpetrator in a video supports, rather than diminishes, probable cause and does not taint a later photographic array identification by a victim. *See, e.g.*, *Stansbury*, 721 F.3d at 88, 90; *Creighton*, 2017 WL 636415, at *4, *27 n.34; *Nzegwu*, 2014 WL 1311428, at *9.

Accordingly, the Court dismisses Plaintiff's fabrication of evidence claims.[28]

---

[28] Plaintiff also asserts a right to fair trial claim under state law based on the same facts as his fabrication of evidence claim under federal law. (Compl. ¶ 37.) However, Plaintiff provides no authority to support his assertion that a claim for the denial of a right to fair trial based on fabrication of evidence is cognizable under New York State law. Indeed, case law suggests that while New York recognizes a claim for the violation of a right to fair trial, it does so in a "narrower set of cases than those recognized by federal courts, none of which reflect the circumstances present here." *Baez v. Jetblue Airways Corp.*, No. 09-CV-596, 2009 WL 2447990, at *8 & n.19 (E.D.N.Y. Aug. 3, 2009) (noting that a fabrication of evidence claim does

### c.  Claims against the City of New York

Plaintiff alleges that, pursuant to the New York common law doctrine of *respondeat superior*, the City of New York is vicariously liable for Detective Sager's actions underlying Plaintiff's state law claims for malicious prosecution and fabrication of evidence.  (Compl. ¶ 36.) Defendants argue that the Court should dismiss Plaintiff's claims against Detective Sager without specifically addressing the vicarious liability claims against the City of New York.  (*See generally* Defs. Mem.)  Because vicarious liability claims cannot lie when the underlying claims have been dismissed, the Court understands Defendants to assert that the Court should dismiss the vicarious liability claims if the Court dismisses the underlying claims.  *See Conte v. County of Nassau*, 596 F. App'x 1, 3 (2d Cir. 2014) ("[T]he dismissal of [the plaintiffs'] underlying theories of liability eliminate[s] the prospect of vicarious liability." (citing *Harsco Corp. v. Segui*, 91 F.3d 337, 339, 349 (2d Cir. 1996))).

Under the New York common law doctrine of *respondeat superior*, an employer may be held liable for the actions of an employee if the employee's actions were foreseeable and within the scope of employment.  *See Doe v. Guthrie Clinic, Ltd.*, 710 F.3d 492, 495 (2d Cir. 2013). The doctrine of *respondeat superior* has been extended to cities and police departments, allowing them to be held liable for unconstitutional actions taken by police officers.  *See Ackerson*, 702 F.3d at 22; *see also Conte*, 596 F. App'x at 3.

As discussed above, the Court dismisses both of Plaintiff's state law claims.  Therefore, summary judgment is appropriate on Plaintiff's vicarious liability claim against the City of New

not appear viable under New York State law even though a claim based on the same facts could be viable under federal law if properly alleged); *see, e.g.*, *Torres v. Jones*, 26 N.Y.3d 742, 771 (2016) (considering allegations of fabricated evidence as evidence to overcome the presumption of probable cause after indictment on a malicious prosecution claim).  Accordingly, the Court dismisses Plaintiff's state law denial of a fair trial claim.

York.  *See Conte*, 596 F. App'x at 3; *Fiedler v. Incandela*, 222 F. Supp. 3d 141, 169 (E.D.N.Y. 2016) ("Having concluded that the [i]ndividual [d]efendants are entitled to judgment as a matter of law with respect to [the] [p]laintiff's claims arising under New York law, the [c]ounty [d]efendants are also entitled to judgment as a matter of law with respect to [the] [p]laintiff's claims for vicarious liability.").

## II.  Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment and dismisses the Complaint in its entirety.  The Clerk of Court is directed to close this case.

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge


Dated:  September 28, 2017
        Brooklyn, New York